# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TONY HARRIS,<br><br>                    Plaintiff,<br>vs.<br><br>STONECREST CARE AUTO CENTER, LLC dba SHELL; VINCENT D. MANNO, Trustee of the VINCENT D. MANNO TRUST; CAROL ANN CARLETON, FILOMENA R. BUCKINGHAM and AMELIA M. LUCAS, Trustees of the CAROL A. CARLETON TRUST, Trustees of the FILOMENA R. BUCKINGHAM TRUST, and Trustees of the AMELIA M. LUCAS TRUST; LARRY M. LUCAS and AMELIA M. LUCAS, Trustees of the LUCAS FAMILY TRUST,<br><br>                    Defendants. | CASE NO. 04CV2593-LAB (LSP)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND ORDER OF DISMISSAL** |

Pursuant to Fed. R. Civ. P. 52(a), these findings of fact, conclusions of law, and order constitute the Court's final decision with respect to the bench trial it conducted on Plaintiff Tony Harris' claims against Defendants. This case was tried to the Court without a jury on September 21 and 22, 2006 on Plaintiff's claims under Title III of the Americans with Disabilities Act ("ADA") and California state claims. The Court exercised supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367. By stipulation and at the request of the parties, the Court visited and examined the physical location of the facility at issue — a Shell gas station. At the close

of Plaintiff's case, Defendants moved for judgment as a matter of law, contending it had been established that Plaintiff lacked Article III standing to bring his federal claims. Defendants cited *Harris v. Del Taco, Inc.*, 396 F. Supp.2d 1107 (C.D.Cal. 2005) (*Del Taco*) for the principle that, in order to have standing to bring a Title III ADA claim, a plaintiff must, at the time the complaint was filed, have the intention to return to the facility in question. The Court's findings of fact and conclusions of law are outlined below.

## I.    FINDINGS OF FACT

The Court makes the following findings of fact on the evidence before it.

### A.    Overview of Testimony

Plaintiff Tony Harris ("Harris") resides in Cottonwood, California, approximately six hundred miles from San Diego. The Stonecrest Care Auto Center (the "Shell station") does business as a Shell gasoline station and is located on Murphy Canyon Road in San Diego. The facilities include a convenience store.

Mr. Harris is disabled. He wears braces on his feet and has difficulty walking. He sometimes uses a wheelchair, and sometimes uses forearm crutches to walk, depending on the level of his pain.

Mr. Harris comes from a large family. He has one brother living in San Diego. In 2003, Mr. Harris' father died and Mr. Harris' brother became depressed. Mr. Harris has since traveled to San Diego to visit his brother.

Although Mr. Harris prefers to fly, he also occasionally drives from Cottonwood to San Diego, which takes between ten and fifteen hours. When he comes to San Diego, he and his brother do not visit at the brother's home because it is not handicap-accessible. At trial, Mr. Harris remembered his brother lived on College Avenue, although he could not recall the address or name any cross streets or landmarks to identify the approximate location of his brother's house. He did not remember, until his memory was refreshed, that his brother had moved to his current house from another location "somewhere near El Cajon Boulevard." He could not recall exactly where his brother had moved from.

Prior to filing suit, Mr. Harris visited the Shell station once, on July 28, 2004. He testified he intended to meet his brother at a McDonald's restaurant (the "McDonald's") located across the street

from the Shell station. From there, the two planned to go to a nearby softball field where his brother's friend would be practicing. Mr. Harris had met his brother's friend only once, did not know his last name, and did not maintain contact with him. On the day in question, Mr. Harris drove to the McDonald's from his hotel on Hotel Circle, roughly seven miles away.

Mr. Harris initially testified he ordered food at the McDonald's, but he later changed his testimony, remembering he did not. *Cf.* Tr. at 44:16–17; 85:6–11; 86:1–4. Instead, after entering McDonald's and determining his brother was not there, he drove across the street to the Shell station, bought gas, and bought some items in the convenience store. He also visited the restroom. In all, he spent roughly twelve to fifteen minutes at the Shell station.

The complaint identifies a number of barriers Mr. Harris allegedly encountered at the Shell station. He testified he could not reach the gas pump while seated in his wheelchair. Instead, he had to use forearm crutches. Mr. Harris also noticed the handicapped parking was poorly marked, the parking lot was uneven, and the handicapped access ramp lacked surface warnings to signal where it started and ended.[1] However, he acknowledged during his testimony not one of these latter conditions actually impeded him.

Harris testified that inside the convenience store, the counter was too high, and there was no informational sign pointing out the location of the restroom. He also identified several problems inside the restroom including: a stall door that would not stay closed; a hard-to-reach toilet paper dispenser; a toilet that was too close to the wall; and a large, obstructing hot water heater and uncovered pipes under the sink. Although Mr. Harris' testimony concerning the toilet, toilet paper holder, and toilet stall door indirectly suggested he used or attempted to use the toilet, he never directly stated he did so.

Mr. Harris testified he wrote to the Shell station to notify the operators of the barriers he faced there, and later visited the station to see whether the barriers had been removed. His testimony regarding this later visit was cursory. He could not recall whether the Shell station ever replied to his letter.

---

[1] According to expert testimony, the surface warnings are supposed to consist of grooves and bumps letting disabled persons know they are at the top of the ramp or are entering a traffic area.

Mr. Harris listed several reasons he might return to the Shell station. Besides his stated interest in visiting the softball field again, he testified he patronizes the McDonald's on Murphy Canyon Road whenever he is in San Diego because he likes McDonald's food and likes that McDonald's restaurant in particular. He also testified he has definite plans to patronize Shell gas stations because he especially likes Shell gasoline.

The evidence at trial established Mr. Harris has brought at least twenty other disability-related lawsuits in the Southern District of California alone, although Mr. Harris could not recall exactly how many.[2] Perhaps owing to the large number of lawsuits, Mr. Harris has problems recalling the details of other cases he had brought. He conceded he has problems with his memory, and has difficulty keeping facts of his visits to various establishments straight.

In at least some of the other cases, he used a notebook and a camera to record violations. On this occasion, he could not remember whether he took any photographs, and it is unclear whether he took any notes. It was clear he waited a significant time before speaking with attorneys about the problems he encountered at the Shell station, although he could not remember how long. Despite his inability to produce records of his visit in this case, he professed confidence he remembered all the details.

### B.   Observations and Evidentiary Analysis

The Court finds Mr. Harris' testimony to be unreliable. He was frequently contradictory on important details, and his testimony was delivered in a rote fashion, as if it had been rehearsed. For example, on direct examination, Mr. Harris appeared confident in reciting the salient events giving rise to his claims. He testified without noticeable reflection and in great detail, proceeding in a narrative fashion, and requiring scarcely any questions to prompt him. At one point on direct examination, he was asked "[W]hat, if any, barriers did you encounter on that day?" (Tr. at 9:24–25.) His uninterrupted answer, identifying and describing the barriers *seriatim* and in specific detail, spans over two full pages of the transcript. (Tr. at 10:1–12:6.) When cross-examined, however, Mr. Harris' initially confident demeanor faltered, and he peppered his testimony with professions of uncertainty

---

[2] Mr. Harris recalled he previously sued "Mr. Chick" for alleged ADA violations. "Mr. Chick" is a fast food restaurant located down the street from the McDonald's on Murphy Canyon Road.

and a lack of memory. For example, at one point on cross-examination, when asked to review alleged barriers listed in the complaint, he was unable to differentiate between those that had inconvenienced him on his visit and those that had not. *See* Tr. at 55:24–56:3 ("Well, I'm not sure of all the barriers, you know. We didn't go over all of them. But I have been talking about barriers that I encountered. The other barriers that didn't affect me — I would guess — I'm not too sure of all of them.") Moreover, while the Court is mindful Mr. Harris did not visit his brother's home, it was nevertheless surprising that he was unable to remember his brother had moved, and that he could not identify with any precision where his brother lived.

The Court further finds the choice of the McDonald's as a meeting place between Mr. Harris and his brother was arbitrary. As the Court's visit to this location confirms, both the McDonald's and the Shell station are located a good distance away from the direct route between Mr. Harris' hotel and his brother's home. There is no apparent reason why Mr. Harris and his brother would regularly meet at that particular location rather than at Mr. Harris' hotel or at any number of other, more proximate, places in San Diego. Indeed, there is no evidence Mr. Harris and his brother ever met at that location other than on July 28, 2004, or will meet there again in the future.

Mr. Harris testified part of the reason he would be returning to the Shell station was it was near the park where he had seen his brother's friend practice softball. According to Mr. Harris, he had visited the park once after his initial visit without his brother to see if people might be practicing, and later on two or three other occasions, the last being the week before the trial. Mr. Harris admitted on cross examination he only met his brother's friend twice, did not know him well, and did not know when he would be playing ball at the field. There was no evidence Mr. Harris' brother routinely visited this park, or that Mr. Harris intended to meet his brother there in the future. Without further explanation, the Court finds it implausible that Mr. Harris, having traveled hundreds of miles to visit his brother, would genuinely expect to pay regular visits to a park to see people he did not know practicing softball.

In the absence of further explanation, which was never supplied, the Court finds it doubtful that Mr. Harris would frequently travel miles out of his way to visit a particular McDonald's restaurant and buy gasoline and convenience store items from a particular Shell station as he testified. To the

contrary, the Court finds that, at the time he filed suit, Mr. Harris did not intend to return to the Shell station.

The Court also finds the thrust of Mr. Harris' testimony concerned hypothetical – not real – problems. For example, his testimony recounting that surface warnings were missing from the handicapped access ramp demonstrates that Mr. Harris was able to identify a condition that might have posed a barrier to someone else but was not, in fact, a barrier to him. He knew where the ramp began and ended even without the surface signals. Mr. Harris' testimony about barriers he encountered in the restroom was likewise hypothetical, as if he had merely visually assessed problems he would have encountered had he actually used the restroom facilities. Mr. Harris testified he was concerned the pipes and hot water heater under the sink in the restroom might injure him. Yet, because he was using his crutches and not his wheelchair in the Shell station, there was no reason for his legs to be under the sink. The Court finds Mr. Harris' purpose in visiting the Shell station restroom in the instant case was to identify potential ADA violations, not to actually use the restroom.

While the Court acknowledges Mr. Harris' right to file ADA lawsuits to remedy denial of access violations, the reality is he has sued so many different establishments that it is impossible to believe he routinely visits the same establishments on each of his visits to San Diego. *See Wilson v. Costco Wholesale Corp.*, 426 F. Supp.2d 1115, 1123 (S.D.Cal. 2006) (expressing concerns that plaintiff's declaration of intent to return to each of the 80 establishments he had sued was implausible, and finding plaintiff lacked intent to return to the specific facility at issue in that case); *Molski v. Mandarin Touch Restaurant*, 385 F. Supp.2d 1042, 1046 (C.D.Cal. 2005) (*Mandarin Touch II*) (finding that the plaintiff's extensive litigation history "undercuts his credibility and belies an intent to return to the Mandarin Touch" and concluding "[a]s a result, [plaintiff's] professed intent to return to the Mandarin Touch is insufficient to establish standing"); *Steven Brother v. Tiger Partner, LLC*, 331 F. Supp.2d 1368, 1374–75 (M.D.Fla. 2004) ("[Plaintiff] has professed an intent to return to all fifty-four of the properties he has sued. This is simply implausible.") In addition, Mr. Harris' inability

/ / /

/ / /

/ / /

1  to keep details of other lawsuits straight raises concerns he may be charging the Shell station with
2  violations he encountered in an entirely separate establishment.[3]

3  Mr. Harris described himself as an advocate for the disabled. While this may be true, he also
4  testified once a lawsuit is over he puts the details behind him and focuses on details of new suits.
5  Taking Harris at his word, the Court finds it is unlikely that Mr. Harris will return to the Shell station
6  on Murphy Canyon Road or monitor its compliance with ADA requirements after the pendency of this
7  lawsuit.

## II. CONCLUSIONS OF LAW

### A. Legal Standards

Standing is a jurisdictional requirement, and a party invoking federal jurisdiction has the burden of establishing it. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Each element of standing is "an indispensable part of the plaintiff's case" and accordingly "must be supported in the same way as any other matter on which the plaintiff bears

---

[3] Furthermore, Mr. Harris' having sued a number of establishments he cannot now remember strongly suggests he no longer patronizes or even visits the establishments he has litigated against. His testimony regarding other lawsuits in that same area is illustrative:

Q: . . .Have you sued anybody else in the Murphy Canyon Road area?
. . .
A: To be honest, I'm not certain. The McDonald's and Shell. I just don't keep track of it like you are.
Q: You don't keep track of the lawsuits in which you're the plaintiff?
A: When I'm dealing with it, I try to keep as close track of it as I can. It's easy to mix things up. In other words, yes, I filed these disabled lawsuits and stuff. But once they're in your past, it's hard to remember their barriers from somebody else's barriers.
Q: I'm not asking about the barriers. I'm just asking about locations. Do you remember another restaurant —
A: I don't recall any other ones.
Q: Does the name Mr. Chick ring a bell?
A: Oh, that's the chicken place. Yeah.
Q: Where was Mr. Chick?
A: I'm not sure.
. . .
Q: Looking at that second page [of a complaint filed November 18, 2004] you see the place that you sued there?
A: Mr. Chick. Yes, sir, I do.
Q: What was the address?
A: It's 5250 Murphy Canyon Road. And to tell you the truth, I actually forgot it was on that road. But I do remember Mr. Chick's.

Tr. at 46:9–47:4, 47:15–25

the burden, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id*. In this case, Mr. Harris must demonstrate his standing to pursue this action by a preponderance of evidence.

The complaint seeks injunctive relief for alleged ADA violations. Under 42 U.S.C. § 12188(b)(2)(B), money damages are not available to private litigants; remedies are instead limited to injunctive relief and attorney's fees and costs. 42 U.S.C. § 12188(a)(1); *Wander v. Kaus*, 304 F.3d 856, 858 (9th Cir. 2002).

"In the context of declaratory and injunctive relief, [the Plaintiff] must demonstrate that [he] has suffered or is threatened with a 'concrete and particularized' legal harm . . . coupled with 'a sufficient likelihood that he will again be wronged in a similar way.'" *Bird v. Lewis & Clark College*, 303 F.3d 1015, 1019 (9th Cir. 2002) (citing *Lujan*, 504 U.S. at 560; and *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lyons*, 461 U.S. at 102, as quoted in *Lujan*, 504 U.S. at 564.

To show he has standing, Plaintiff must establish three things:

> First [he must have] suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560–61 (citations and internal quotation marks omitted). In the ADA context, "a disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA has suffered 'actual injury.' Similarly, a plaintiff who is threatened with harm in the future because of existing or imminently threatened non-compliance with the ADA suffers 'imminent injury.'" *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1138 (9th Cir. 2002).

### B. Relevance of Multiple Lawsuits

As noted, Plaintiff has filed many Title III lawsuits — indeed, more than he can remember. The widespread practice of filing large numbers of lawsuits under Title III and joining state law claims for damages has drawn the notice and commentary of a number of courts. *See, e.g., Doran v. Del*

*Taco, Inc.*, 373 F. Supp.2d 1028, 1030 (C.D.Cal. 2005) (discussing and commenting on abusive "shakedown schemes"); *Rodriguez v. Investco, LLC*, 305 F. Supp.2d 1278, 1280–82 (M.D.Fla. 2004) (referring to ADA plaintiff as a "professional pawn in an ongoing scheme to bilk attorney's fees"); *Steven Brother*, 331 F. Supp.2d at 1375 (calling for a legislative solution to the unchecked potential for vexatious ADA litigation).

California courts, too, have commented on the readiness of some plaintiffs and their counsel to abuse state law provisions intended to protect disabled persons from discrimination.

> The abuse is a kind of legal shakedown scheme: Attorneys form a front "watchdog" or "consumer" organization. They scour public records on the Internet for what are often ridiculously minor violations of some regulation or law by a small business, and sue that business in the name of the front organization. Since even frivolous lawsuits can have economic nuisance value, the attorneys then contact the business (often owned by immigrants for whom English is a second language), and point out that a quick settlement (usually around a few thousand dollars) would be in the business's long-term interest.

*People ex rel. Lockyer v. Brar*, 115 Cal.App.4th 1315, 1317 (Cal.App. 4 Dist. 2004).

The Court notes that this pattern of litigation, in order to be profitable to a law firm, requires high volume, which can, at times, be abusive. *See Molski v. Mandarin Touch Restaurant*, 347 F. Supp.2d 860, 866–67 (C.D.Cal. 2004) (*Mandarin Touch I*) (referring to plaintiff's high-volume "shotgun litigation" tactics); *Doran*, 373 F. Supp.2d at 1030 (in abusive ADA litigation, "[a]n unscrupulous law firm sends a disabled individual to as many businesses as possible in order to have him or her aggressively seek out all violations of the ADA.")  Typically, in abusive litigation, a plaintiff files suit, extracts a cash settlement, and loses all interest in the defendant's future compliance with the ADA. *Mandarin Touch I*, 347 F. Supp.2d at 866 (litigant's *modus operandi* was "sue, settle, and move on to the next suit"). Such practices represent an end-run around the ADA's limitations on remedies. *Doran*, 373 F. Supp.2d at 1030 ("Enterprising plaintiffs and their attorneys have found a way to circumvent the will of Congress by seeking money damages while retaining federal jurisdiction.") Furthermore, because the plaintiff in such cases is focused on a short-term reward, the ADA action provides little, if any, long-term assistance to disabled persons generally who genuinely wish to patronize local businesses. *Id.* (observing that in abusive ADA litigation, monetary awards

///

1  have become more important than access for disabled persons, which has undermined both the spirit
2  and purpose of the ADA) (quoting *Mandarin Touch I*, 347 F. Supp.2d at 863).

3  Federal courts must be diligent in observing standing requirements. *B.C. v. Plumas Unified
4  School Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999) (holding that federal courts are required to examine
5  jurisdictional issues such as standing, even sua sponte if necessary). And, particularly in view of a
6  recognized trend of abusive ADA litigation, *see Molski v. Arby's Huntington Beach*, 359 F. Supp.2d
7  938, 941 (C.D.Cal. 2005) (*Arby's*) (expressing the court's concern that plaintiff's "ADA claims in that
8  case may be a sham, used as a pretext to gain access to the federal courts while pursuing state law
9  remedies"), special diligence and vigilant examination of the standing requirement are necessary and
10 appropriate to ensure the litigation serves the purposes for which the ADA was enacted.

11 **C. The Likelihood of Plaintiff's Return to the Shell Station on Murphy Canyon Road**

12 Both actual injury, which includes deterrence and causation in its definition, and imminent
13 injury, which includes a threat of future harm, require, at the very least, that a plaintiff be likely to
14 return to patronize the accommodation in question. *Compare Pickern*, 293 F.3d at 1138 (holding that
15 standing was established where disabled plaintiff would patronize defendant store if barriers were
16 removed) *with Moreno v. G & M Oil Co.*, 88 F. Supp.2d 1116, 1116 (C.D.Cal. 2000) (disabled
17 plaintiff could not show actual injury with respect to defendant's other gas stations, because plaintiff
18 "[did] not claim he wants to visit the other stations, or will ever do so").

19 Commenting on this requirement, the Eighth Circuit has held that disabled plaintiffs "must at
20 least prove knowledge of the barriers and that they would visit the [accommodation] in the imminent
21 future but for those barriers." *Steger v. Franco, Inc.*, 228 F.3d 889, 892–93 (8th Cir. 2000). "Intent
22 to return to the place of injury 'some day' is insufficient." *Id.* (quoting *Lujan*, 504 U.S. at 564).

23 In determining whether a plaintiff's likelihood of returning to a particular establishment is
24 sufficient to confer standing, courts have examined factors such as: (1) the proximity of the place of
25 public accommodation to plaintiff's residence, (2) plaintiff's past patronage of defendant's business,
26 (3) the definiteness of plaintiff's plans to return, and (4) the plaintiff's frequency of travel near the
27 accommodation in question. *Harris*, 392 F. Supp.2d at 1113 (citing *Arby's*, 359 F. Supp.2d at 947
28 n.10).

All four factors, in varying degrees, weigh against finding Plaintiff has standing in this case. To begin with, the Shell station is far from Plaintiff's home — hundreds of miles, in fact. Mr. Harris could not remember having patronized the Shell station on any other occasion before filing suit. Furthermore, he had no definite plans to return to the facility, and the Court finds he would have little reason to do so. While the Court acknowledges drivers generally do not plan which gasoline stations they will visit, or when they will do so, it is nonetheless purely speculative and conjectural to infer Mr. Harris will ever again patronize the Shell station on Murphy Canyon Road. *Compare Parr v. L & L Drive-Inn Restaurant,* 96 F. Supp.2d 1065, 1079 (D.Haw. 2000) (refusing to require plaintiff to show concrete evidence of intent to return to a fast food restaurant) *with Del Taco*, 396 F. Supp.2d at 1115 (interpreting *Parr* as holding that ADA plaintiffs must show intent to return, but that in the fast food context they may show it without producing concrete evidence of their plans to return).

As to the fourth factor, at the time of filing, Plaintiff did not frequently travel near the Shell station. His usual business brought him to San Diego only occasionally. Although Plaintiff testified of past visits to his brother, and of his concern for his brother's well-being in the wake of their father's death, no evidence was presented showing that Plaintiff had definite and particular plans to return to San Diego. *See Wilson*, 426 F. Supp.2d at 1120 (holding that ADA plaintiff's "lack of concrete plans, or indeed of any specification of when he will return" to defendant's place of business "do not support a finding of an 'actual or imminent' injury as required by law").

Where, as here, a plaintiff has filed many lawsuits to vindicate his rights under Title III of the ADA, some courts have held he has necessarily declared his intention to return to each facility sued. *Wilson*, 426 F. Supp.2d at 1123; *D'lil v. Best Western Encina Lodge & Suites,* 415 F. Supp.2d 1048, 1058 n.14 (C.D.Cal., 2006). The Court rejects reliance on such an automatic or presumptive approach, and embraces instead a fact-specific inquiry. In this case, the Court finds Plaintiff has filed a particularly large number of Title III lawsuits in this district considering his limited presence in the area. The Court further finds the large number of Title III claims brought by Plaintiff raises concerns about credibility. *Wilson* at 1122. "Courts disagree as to whether the litigation history of the Plaintiff is relevant when considering whether a plaintiff has standing." *Id.* This disagreement, however, stems from whether it is appropriate for the court to evaluate credibility: when it is not appropriate, the

1  litigation history does not appear relevant, but where (as here) it is appropriate, courts have found the
2  litigation history relevant. *Wilson* at 1122–23 (comparing cases); *D'Lil* at 1058 n.14 ("[T]he very fact
3  that [the plaintiff] must have alleged an intention to return to these many and varied businesses is
4  relevant to analyzing the credibility of the testimony.")  The Court therefore considers Mr. Harris'
5  extensive history of ADA litigation as part of its factual determination of the likelihood that he will
6  return to the Shell station.

7  Standing is established as of the time of the complaint. *See Friends of the Earth, Inc. v.*
8  *Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191, 120 S.Ct. 693, 709, 145 L.Ed.2d 610 (2000).
9  In determining whether, at the time of filing, Plaintiff was likely to return, the Court does not consider
10 evidence showing Plaintiff visited the Shell station, or nearby attractions such as the park, after filing
11 suit. *See Del Taco*, 396 F. Supp.2d at 1116 (refusing to consider plaintiff's post-filing visit to the
12 defendant restaurant in determining whether it was likely, at the time of filing, he would return).  "If
13 the courts were to consider [post-filing visits] as evidence of intent to return, plaintiffs could easily
14 manufacture standing." *Id.*

15 The Court holds that because, as of the date of filing, Mr. Harris was not likely to return to the
16 Shell station, he lacks standing to bring a Title III claim.

17 **D. How Plaintiff's Purpose in Visiting the Shell Station Affects Redressability**

18 The Court also finds on the one occasion Mr. Harris visited the Shell station, he did so for
19 purposes of bringing a case against it. Consequently, once this litigation is over, his motive for visiting
20 this particular station will be gone. The Court finds it probable that Mr. Harris' brief experience at the
21 Shell station will parallel his fleeting visit to Mr. Chick and the many other establishments he has sued
22 but cannot now fully remember.  The Court believes Mr. Harris' motive in visiting the Shell station
23 is relevant to its determination of whether injunctive relief would redress his injury.

24 The Court is aware of apparently contrary dicta regarding the relevance of the plaintiff's
25 motivation for visiting a business facility only for the purpose of initiating an ADA lawsuit. *See*
26 *Organization for Advancement of Minorities with Disabilities v. Brick Oven Restaurant*, 406
27 F. Supp.2d 1120  (S.D.Cal. 2005).  In *Brick Oven*, the court opined the standing requirement in an
28 ADA case would be met even if plaintiff visited the facility — there a restaurant — solely for the

purpose of determining whether barriers existed. 406 F. Supp.2d at 1126 n.5 (citing *Arby's*, 359 F. Supp.2d at 947–48) (further citations omitted).

The district court in *Arby's* likewise observed, also in dicta, "It simply does not matter, from a jurisdictional and standing point of view, what [a plaintiff's] motivation was for visiting [a business establishment]." 359 F. Supp.2d at 941. *Arby's* also dealt with a motion to dismiss at the pleading stage, where the court was required to assume that the plaintiff did intend to return to the defendant restaurant, as he had alleged. *Id. Arby's* further qualified its remarks by opining that a mixed motive for visiting the defendant business establishment would support standing. *Id.* at 947–48 (citing *Molski v. Price*, 224 F.R.D. 479, 483 (C.D.Cal. 2004)).

The Court finds *Brick Oven* and *Arby's* are distinguishable if, for no other reason than both cases discuss the standing requirement at the pleading stage. Where a court must assume at the pleading stage that a disabled plaintiff will return in the future to a defendant business establishment as alleged, the plaintiff's motivation for doing so may be irrelevant. The Court agrees that motivation for patronizing a business establishment is not itself an element of a Title III claim. But the motivation behind a plaintiff's visit to a defendant business establishment may inform the question of redressability (an element of standing) and therefore takes on greater significance at later stages in litigation. For this reason, the Court finds applying the dicta in *Brick Oven* and *Arby's* to later stages of litigation would be inconsistent with Supreme Court and Ninth Circuit precedent, and the guidance of other federal courts on the issue of redressability.

The Court examines redressability separately from standing because redressability affects not only standing, but also mootness. While standing is established as of the filing of the suit, a claim may become moot even after filing if a litigant does not continue to have a personal stake in the outcome of the lawsuit that is likely to be redressed by a favorable decision. *Rhodes v. Stewart*, 488 U.S. 1, 4, 109 S.Ct. 202, 203 (1988) (claim for injunctive relief from certain prison regulations became moot before judgment was entered, where developments after filing suit resulted in plaintiffs receiving no benefit from a favorable ruling).

The Supreme Court has held that in order to establish standing to seek injunctive relief, a plaintiff must demonstrate "a real and immediate threat of future injury by the defendant." *Lyons*, 461

U.S. at 107 n.8. This requirement has given rise to the "intent to return" test: in the specific case of ADA claims against another service station, one district court has held that "in order to establish standing to seek injunctive relief, Plaintiff here must demonstrate that he has the intent to return to the service station." *Price*, 224 F.R.D. at 483. *Price* explained that, while a plaintiff's motivation for returning was irrelevant, his actual intent to return was required. *Id.* at 484. The *Price* court acknowledged a plaintiff could establish standing even if he were dually motivated both by the intent to patronize the establishment and by the desire to check ADA compliance. *Id.* Implicit in this acknowledgment is the principle that if a plaintiff's sole purpose in visiting an establishment were to check for ADA violations, he would be simply a "tester" rather than a bona fide patron, and would therefore lack standing. *Cf. Clark v. McDonald's Corp.*, 213 F.R.D. 198, 227 (D.N.J. 2003) (declining to reach issue of standing where there was no reason to believe plaintiff visited restaurants solely as a tester).

Although the factors commonly applied by federal courts in Title III cases against private businesses require a plaintiff intend to return, *see Harris*, 392 F. Supp.2d at 1113, guidance varies regarding whether plaintiff may satisfy this requirement even if he visits the establishment solely as a tester. In the civil rights context, testers do not *per se* lack standing, provided the harm they suffer is the type the statute was intended to guard against. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373, 102 S.Ct. 1114, 1121 (1982) (holding that, where statute conferred on all persons a legal right to truthful information about available housing, testers who had no intention of renting or purchasing a residence nevertheless had Article III standing to sue if they were denied the truthful information they sought). At least one circuit has held that a disabled "tester" has standing to seek injunctive relief under Title II of the ADA, which forbids discrimination in the provision of public services, even if he is not a bona fide patron. *Tandy v. City of Wichita*, 380 F.3d 1277, 1286–88 (10th Cir. 2004) (holding that disabled passenger whose sole purpose in riding city buses was to test for ADA compliance had standing to seek prospective injunctive relief). In so holding, the court relied on "Congress' intent to confer standing to the outer limits of Article III." *Id.* at 1287. The court noted, however, that as a tester, the plaintiff would in fact be riding the buses and would, when he was doing so, be limited by the barriers he complained of. *Id.*

This Court is unable, however, to find any authority showing that Title III of the ADA was intended to create such broad rights against individual local businesses by private parties who are not bona fide patrons, and are not likely to be bona fide patrons in the future. Where a plaintiff's sole purpose in visiting a local business is to litigate, he may visit the establishment before or during the litigation, but his reason for returning vanishes as soon as litigation is concluded. This is particularly true in California, where money damages are available under state law claims, and where plaintiffs habitually join supplemental state claims for damages. *See Mandarin Touch I*, 347 F. Supp.2d at 863 (observing that, where money damages are available for supplemental state claims, Title III plaintiffs frequently focus on obtaining damages rather than pursuing accessibility for disabled individuals). *See also id.* at 867 ("[T]he Court believes that [the plaintiff's] ADA claims are a sham, used as a pretext to gain access to the federal courts, while he pursues remedies that are available — sometimes exclusively — under California state law.")

"[T]he ADA is designed 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Tennessee v. Lane*, 541 U.S. 509, 516, 124 S.Ct. 1978, 1984 (2004) (quoting 42 U.S.C. §§ 12101(b)(1), (b)(4)). Title III of the ADA was intended to remedy discrimination in the area of public accommodations. *Id.* In deciding a Title III claim, the Court therefore examines redressability in terms of whether any injunctive relief it might award would remedy discrimination against a disabled plaintiff in the area of public accommodations.

A plaintiff who visits a local business solely in order to bring a Title III claim (to which supplemental state claims may be joined) fails to meet the redressability requirement for Article III standing. *See Lujan*, 504 U.S. at 561 ("[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.") Where litigation is the only reason for a plaintiff's visit to a particular local establishment, once litigation is complete it is unlikely such a plaintiff will return to avail himself of the business' goods or services, or to visit the local business for any other reason. Any permanent injunction obtained in the course of litigation might benefit others, but it would not benefit the plaintiff. In other words, any injury the plaintiff suffered would not likely be redressed by a favorable decision. By contrast, where a plaintiff's interests in patronizing or visiting

///

the establishment extend beyond the end of litigation, injunctive relief may redress the plaintiff's injury.

Therefore, the Court holds that an individual plaintiff's contact with a local establishment made solely for the purpose of bringing a claim under Title III of the ADA, without more, is insufficient to confer Article III standing to seek injunctive relief. Because the Court finds Mr. Harris visited the Shell station solely for the purpose of bringing a Title III claim and supplemental state claims, any injunctive relief it might grant would not satisfy the redressability requirement for standing. *See Lujan*, 504 U.S. at 561.

## III.   CONCLUSION AND ORDER

Because Mr. Harris lacks Article III standing to pursue claims under Title III of the ADA, the Court lacks jurisdiction to hear this claim. *See Lujan*, 504 U.S. at 561 (standing is a jurisdictional requirement). Mr. Harris' federal claim is therefore **DISMISSED WITH PREJUDICE**.

The federal claim having been dismissed for want of jurisdiction, the Court cannot exercise supplemental jurisdiction to hear Mr. Harris' state law claims. *Herman Family Revocable Trust v. Teddy Bear*, 254 F.3d 802, 806 (9th Cir. 2001) (holding that, where all federal claims had been dismissed on jurisdictional grounds following a bench trial, the trial court could not exercise supplemental jurisdiction over related claims brought under state law). Accordingly, Mr. Harris' California state claims are **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED**.

DATED: February 5, 2007

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge